**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

```
MIGUEL A. SUAREZ,                 :
                                  :    Civil Action No. 10-6209 (FSH)
             Petitioner,          :
                                  :
        v.                        :    OPINION
                                  :
GREG BARTKOWSKI, et al.,          :
                                  :
             Respondents.         :
```

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>                 Counsel for Respondents
Miguel A. Suarez                      Catherine Antoine Foddai
New Jersey State Prison               Bergen Co. Prosec. Office
Trenton, NJ  08625                    Hackensack, NJ  07601

**HOCHBERG**, District Judge

　　Petitioner Miguel A. Suarez, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Administrator Greg Bartkowski and the Attorney General of New Jersey.

　　For the reasons stated herein, the Petition will be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> According to the State's proofs at trial, on October 23, 1997, the blood-covered bodies of [Rajesh] Kalsaria, [Ajit] Hira, and [Bhushan] Raval were discovered inside Kalsaria's home at 71 Chestnut Street in Bogota.  Hira and Kalsaria had been shot in the head at close range while they were lying face down on the floor, bound by duct tape.  Raval had been shot in the face, likely while kneeling, and then stabbed twenty-six times in the neck, chest and abdomen before dying from his wounds.  Over $60,000 in diamonds, gold jewelry and cash had been taken from the house, and Hira's Toyota Avalon was missing from Kalsaria's driveway.

> Investigation at the scene uncovered pieces of a rubber silencer, as well as a knife covered with blood, later confirmed to be that of the victim Raval.  Police also recovered several nine-millimeter bullets and a number of spent shell casings.  It was subsequently determined that all of the bullets and casings had been discharged from the same weapon, which could have been a MAC 11 automatic firearm.

> The State's investigation disclosed that Dimpy Patel, a wealthy entrepreneur in his thirties, first met Darwin Godoy, a twenty-year old Secaucus student who had hoped to secure employment with Patel through Patel's cousin, sometime in August 1997.  Shortly thereafter, Patel requested that in return for $10,000, Godoy find a hit man who would be willing to do a job for him.  Godoy had been acquainted with defendant

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

2

Suarez, with whom he had been selling illegal cloned cell phones.  Godoy knew Suarez to be a violent person who had bragged that he enjoyed killing people.  Godoy arranged a meeting between Suarez and Patel, which he also attended.

During that meeting, Patel told Suarez that he wanted to hire him to kill a diamond merchant and that if he agreed, Suarez could keep any jewelry and cash he found inside the diamond merchant's home, estimated by Patel to be worth $200,000.  Neither the identity nor address of the diamond merchant was disclosed by Patel at that time.  After reaching an agreement, Patel gave $1,000 to Godoy for he and Suarez to purchase a firearm with a silencer.  Thereafter, Suarez, co-defendant Morales, who was a long-time friend of Suarez, Godoy, and another man, Eddie Nieves, drove into New York City where Godoy and Suarez purchased a MAC 11 automatic firearm with a silencer from someone named "Mike," to whom they were introduced by Nieves.

Two days before the murders, Patel telephoned Godoy and provided the address of Kalsaria, the diamond merchant, which was 71 Chestnut Street, Bogota.  The next day, Godoy and Suarez drove by the house.  The following day, October 23, Godoy met Suarez, who was accompanied by Morales, [fn1] and they drove in separate vehicles to Bogota - Godoy in his Subaru, and Suarez and Morales in Suarez's Honda.  After parking his vehicle, Godoy entered Suarez's vehicle and they drove to the area of 71 Chestnut Street.

> [fn1] According to Godoy, until he saw Morales in Suarez's car, he had not known that Morales was going to be involved.

Suarez showed Godoy a light blue bullet-proof vest he intended to wear while carrying out the job, as well as the MAC 11 and silencer.  Suarez also advised that he had brought along a nine-millimeter handgun and some duct tape which he planned to place over the victim's mouth, at which time Morales drew his hand across his mouth to pantomime what was going to occur.  Suarez instructed Godoy to act as a lookout while he and Morales entered the residence and completed the hit.  Suarez and Morales exited the vehicle, with Suarez carrying the firearm.

Godoy then returned to his car, drove by 71 Chestnut Street, circled back and parked a short distance away.  From where he remained inside the parked vehicle, Godoy spotted Suarez and Morales walking along Chestnut Street towards the diamond merchant's home.  Moments later, though, Godoy saw the pair walking back towards their car.  Thereafter, Suarez called Godoy on his cell phone and advised that there were three men inside the house and that he did not know what to do.  However, after a pause, Suarez said, "Fuck it.  I'm going to do it."

Immediately thereafter, a police car operated by Officer James Sepp of the Bogota Police Department pulled alongside Godoy's vehicle to investigate why Godoy was parked there.  Godoy told Officer Sepp he had been sent by his brother Carlos, the owner of J&J Maintenance in North Bergen, to estimate a garage for an upcoming construction project.  During the conversation with Officer Sepp, Godoy's cell phone rang approximately five times, with Godoy abruptly terminating the calls.  After some additional questioning, Godoy admitted to Officer Sepp that the three cell phones in his possession might be cloned phones.  Officer Sepp seized the phones, issued two summonses to Godoy for various traffic violations, and let him go.  Godoy then left the area, purchased a phone card and called Suarez, who informed Godoy that he had "whacked him" and had stolen various jewelry and diamonds from the home.  Later, Godoy reported the information to Patel, who told Godoy that Suarez had dropped off some jewelry and diamonds and had left for Puerto Rico.

After the murders were discovered, Officer Sepp recalled the incident with Godoy, who had been present near the murder scene at or about the estimated time of the three murders.  After being located and questioned during the police investigation, Godoy confessed to his involvement in the murders, implicating Suarez, Morales and Patel.

Based upon Godoy's statement, officers were dispatched to locate and apprehend Patel, Suarez and Morales.  While police searched Morales' home shortly after his arrest at 3:00 a.m. on October 24, 1997, the phone rang and a man later identified as Suarez left a

4

message for Morales urging him to call back because there was an emergency.

Although police at first were unable to locate Suarez, they searched his Newark home and found a light blue bullet-proof vest hidden under a mattress.  Later, when Sergeant Richard Barbato was speaking to Suarez's girlfriend, Betsy Tufino, at her apartment, Suarez called and Tufino handed the phone to Sergeant Barbato. The officer identified himself and told Suarez that he was investigating a triple homicide in Bogota which had taken place the day before.  After denying any knowledge, Suarez angrily responded that the police would never find him and that he was not going to turn himself in.  He then hung up.  However, later that same day, Suarez did surrender to police at his attorney's office.

According to Tufino, who testified at trial, in early October 1997, she complained to Suarez about the frequent phone calls he was receiving from Godoy, whom she called by his nickname "Giovanni."  Tufino was aware that Giovanni wanted Suarez to rob and kill an Indian man in return for $20,000 and some diamonds. Although she begged Suarez not to do it, Suarez would not respond.  A few days later she overheard Suarez talking on the phone with Giovanni and again heard Giovanni encouraging Suarez to "do it."  She also claimed that at some point prior to October 23, 1997, she overheard Morales tell his girlfriend on the telephone that he was going to rob and kill an Indian man. [fn2]

> [fn2] Tufino admitted that in her first two
> statements to the police, she never mentioned the
> frequent phone calls from Giovanni or the intended
> plot to rob and murder an Indian man.  She also
> acknowledged giving a videotaped statement to a
> defense investigator where she claimed that, in
> her third statement to police, she had merely
> repeated what she had read in the newspaper about
> the case, but explained Suarez's father had asked
> her to change her statement and that it was not
> the truth.

Patel was arrested at 8:00 a.m. on October 24, 1997 as he was driving away from his Gloucester Township home.  A search of his car uncovered a bag

containing a .45 caliber gun, several jewelry boxes containing assorted jewelry, Indian currency, and several clear gemstones.  During a subsequent search of Patel's home, police found a piece of paper on which the name "Rajesh Kalsaria" had been written, along with Kalsaria's phone number, address and the notation "brick house."  Police also found a Casio organizer, and a second piece of paper containing the name "Angel" (Suarez's nickname) and several telephone numbers later identified as Suarez's cell phone and pager numbers. Police also discovered Patel's address book, which had Godoy's phone information, another piece of paper with Godoy's number, and a business card for J&J Maintenance, Inc.

Hira's Toyota, which someone had tried unsuccessfully to burn, was ultimately located several blocks away from Suarez's home in Newark.  Fibers gathered from Suarez's Honda Accord were subsequently determined to match fibers found on the duct tape removed from the murdered men.

Telephone records of the four conspirators were obtained and confirmed that between October 1 and 24, 1997, there were numerous calls between Godoy, Suarez and Patel.  Godoy and Suarez had been on the phone for forty-one minutes just before Officer Sepp approached Godoy's parked Subaru on the day of the murders, and Suarez called Godoy back five minutes later while Godoy was being interviewed by police.  Suarez also called Godoy three more times in rapid succession.  According to Kalsaria's caller i.d., Suarez had called the Kalsaria home at 12:07 p.m. in an apparent attempt to ascertain who was home.

There was finally the testimony of George Rivera who met Suarez in December 1997 when they were cell mates for two weeks in the Bergen County Jail.  Rivera renewed the acquaintance, and also met Morales, when he was reincarcerated at the jail for several weeks in February 1998, and then resumed his friendship with both men when he returned to the jail again in March 1999.  Rivera maintained that, during his third period of incarceration, Suarez revealed to him the details of the murder plot which had landed him and Morales in jail.  Rivera recalled that Morales was present as Suarez recounted the story, but that he simply nodded without making any comments.

According to Rivera, Suarez claimed that Godoy had introduced him to Patel, who said he was an FBI agent and who offered to pay him $50,000 to kill someone who had swindled some friends of his.  The deal also included Suarez receiving all the diamonds and money in the house.  After agreeing to do the job, Suarez obtained two nine-millimeter handguns and a MAC 11 with a silencer with the help of one "Eddie."  Suarez went to the Bronx to obtain the MAC 11 for which he handed over $1,500 in cash, plus a video game system.  Suarez asked Morales to accompany him when he went to do the job and agreed to pay him for his assistance.

Suarez told Rivera that, on the day of the murders, he and Morales met up with Godoy and the trio drove to Bogota in two cars.  Suarez was wearing a bullet-proof vest, and had stored the MAC 11, silencer and duct tape in a duffle bag.  He and Morales were also each carrying a nine-millimeter handgun.

After Godoy took up his position as a look-out, Suarez and Morales approached the house and began to bluff their way in using a brochure, but abandoned the plan after noticing that there were two other men in the house.  However, after leaving and calling Godoy, Suarez decided to go back and kill everyone in the house.

Once Suarez and Morales had forced their way into the house, and put on the rubber gloves they had brought with them, Suarez ordered Morales to tie the three men up on the floor with duct tape while he assembled the MAC 11.  Suarez then sent Morales upstairs to look for the diamonds and cash, but when he failed at this task, Suarez himself searched and located the cache.  When Suarez came back downstairs, he noticed that the three victims were speaking among themselves in a foreign language and so he ordered Morales to gag them with the duct tape.  After some more searching, Suarez shot the homeowner, and then the other two men, with the MAC 11.  When it became clear that the third man was not dead, Suarez directed Morales to get him a knife.  Suarez then proceeded to stab the third man repeatedly in the chest.

After exiting the house, Suarez and Morales stole the Toyota Avalon which was sitting in the driveway and drove to Suarez's Honda, which Morales subsequently

drove back to Newark.  Suarez drove the Toyota to
Newark and gave it to some neighborhood friends to
burn.  He hid the bullet-proof vest under his brother's
mattress and the guns in his father's garage.  Later
that day, Suarez met with Patel and handed over the
diamonds and other jewelry he had taken from the house.
Upon learning that the police were after him, Suarez
asked his father to get rid of the guns.

In return for Rivera's testimony, the prosecutor
agreed to recommend that he receive a seven-year prison
term, with a three-year stipulation, on all of his
pending New Jersey charges.  However, Rivera had
multiple pending robbery cases in Pennsylvania and
Connecticut which were not covered by this deal.
Rivera conceded that, in his original statement to the
prosecutor, he never said that Morales was present and
nodding his head while Suarez recounted the details of
the murder plot.

Godoy's statement, the physical and documentary
evidence including telephone records, and the testimony
of Nieves, Suarez's girlfriend Betsy Tufino, and
Suarez's cell mate George Rivera, all constituted
overwhelming evidence of defendants' guilt.

(Answer, Ex. 3, Opinion of Superior Court of New Jersey,

Appellate Division, at 5-15 (May 21, 2004).)

B.   Procedural History

Following a jury trial, Petitioner was convicted of

(1) second-degree conspiracy to commit armed robbery, N.J.S.A.

2C:15-1 and 2C:5-2 (count two); (2) second-degree conspiracy to

commit murder, N.J.S.A. 2C:11-3 and 2C:5-2 (count three);

(3) third-degree unlawful possession of an assault firearm,

N.J.S.A. 2C:39-5(f) (count four); (4) fourth-degree unlawful

possession of a firearm silencer, N.J.S.A. 2C:39-3(c) (count

five); (5) third-degree possession of a handgun without a permit,

N.J.S.A. 2C:58-4 (count six); (6) second-degree unlawful possession of a weapon with the purpose to use it unlawfully, N.J.S.A. 2C:39-4(a) (count seven); (7) first-degree robbery, N.J.S.A. 2C:15-1 (count eight); (8) three counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (counts twelve through fourteen); and (9) three counts of felony murder, N.J.S.A. 2C:11-3(a)(3) (counts fifteen, sixteen, and seventeen).

After merging various counts, the court sentenced Petitioner to three consecutive terms of life imprisonment, each with a 30-year parole disqualifier, on counts twelve, thirteen, and fourteen.  The court also imposed a concurrent 20-year term of imprisonment, with ten years of parole ineligibility, on count eight (robbery); a concurrent 18-month term of imprisonment on count five (unlawful possession of a firearm silencer); and two concurrent five-year terms of imprisonment on counts six (possession of a firearm without a permit) and four (unlawful possession of a firearm).  Petitioner's aggregate sentence was, thus, three life terms with a ninety-year parole ineligibility period.

On direct appeal, the Superior Court of New Jersey, Appellate Division, affirmed the convictions, but remanded for sentence modification, agreeing in part with Petitioner's challenge to the application of New Jersey's No Early Release Act, N.J.S.A. 2C:43-7.2.  (Answer, Ex. 3.)  The Supreme Court of

New Jersey denied certification on September 23, 2004.  <u>State v. Suarez</u>, 181 N.J. 547 (2004).

While Petitioner's direct appeal was pending, he filed a motion for new trial on the basis of newly-discovered evidence.[2] On October 25, 2005, the trial court denied the motion, finding the newly-discovered evidence cumulative and not material, and unlikely to change the jury verdict.  The Appellate Division affirmed, <u>State v. Suarez</u>, 2009 WL 249092 (N.J. Super. App. Div. Feb. 4, 2009), and, on April 23, 2009, the Supreme Court of New Jersey denied certification, <u>State v. Suarez</u>, 199 N.J. 132 (2009).

In November 2005, Petitioner filed a petition for post-conviction relief, which the trial court denied on October 26, 2007.  The Appellate Division affirmed the denial of relief. <u>State v. Suarez</u>, 2010 WL 2010930 (N.J. Super. App. Div. May 18, 2010).  On October 7, 2010, the Supreme Court of New Jersey denied certification.  <u>State v. Suarez</u>, 204 N.J. 39 (2010).  This Petition timely followed.

---

[2] After Petitioner's trial, Godoy successfully sought to vacate his plea bargain and was tried, at which time he recanted his earlier testimony about being paid by Patel to arrange the murder and about receiving $10,000 from Patel for being a lookout.  In addition, at Patel's separate trial, Patel testified that another individual, also named "Angel," and not Petitioner, gave him a bag with jewelry immediately after the murders.  The foregoing testimony constituted the "newly-discovered evidence."

Here, Petitioner asserts the following grounds for relief: (a) prosecutorial misconduct,[3] (b) the trial court improperly admitted Petitioner's telephonic statements to an investigator, made before Petitioner was advised of his rights, allegedly in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights, (c) ineffective assistance of trial counsel,[4] (d) ineffective assistance of appellate counsel,[5] (e) the state's failure to preserve and test blood stains on Darwin Godoy's

---

[3] More specifically, Petitioner asserts that, during summation, the prosecutor made remarks emphasizing to the jury Petitioner's failure to testify in his defense, including the use of pre-printed boards. Petitioner also asserts that the prosecutor failed to disclose that George Rivera's cousin was employed by the prosecutor's office.

[4] More specifically, Petitioner challenges his counsel's failure to present evidence regarding the discovery of George Rivera's handwritten recantation letter, failure to present testimony of Nicholas Kyriazis to discredit George Rivera's testimony, failure to present testimony of Melvin Collins to discredit George Rivera's testimony, failure to present evidence establishing that George Rivera had access to Petitioner's pretrial discovery, failure to present an expert in fiber analysis, failure to present a statistician to testify regarding the state's fiber evidence, failure to move to suppress Glenn Kohles's out-of-court identification of Petitioner, failure to present an expert in eyewitness identification to counter Kohles's out-of-court identification, failure to utilize existing blood evidence as proof of Petitioner's innocence, failure to present a quasi-alibi defense based on Petitioner's presence at his girlfriend's house several hours before and several hours after the murder, and failure to present evidence that Edwin Nieves was hospitalized at the time he was alleged to have accompanied Petitioner to purchase the murder weapon.

[5] More specifically, Petitioner challenges appellate counsel's failure to challenge the trial court's omission of a general identification charge and a specific cross-racial identification charge.

11

clothing deprived Petitioner of his Sixth and Fourteenth Amendment rights, and (f) cumulative error deprived Petitioner of his Sixth and Fourteenth Amendment rights.

Briefing is complete and this matter is now ready for decision.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the

state court confronts a set of facts that are materially
indistinguishable from a decision of th[e] Court and nevertheless
arrives at a result different from [the Court's] precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  Chadwick v.
Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v.

13

<u>Angelone</u>, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  <u>See</u> <u>Hameen v. State of Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000), <u>cert. denied</u>, 532 U.S. 924 (2001); <u>Purnell v. Hendricks</u>, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  <u>See also</u> <u>Schoenberger v. Russell</u>, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).  In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA."  <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001) (citing <u>McCandless v. Vaughn</u>, 172 F.3d 255, 260 (3d Cir. 1999)).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence."  <u>Simmons v. Beard</u>, 581 F.3d 158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent."  <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002) and <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

14

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

III.  ANALYSIS

A.   Prosecutorial Misconduct

As noted above, Petitioner asserts that, during summation, the prosecutor made remarks emphasizing to the jury Petitioner's failure to testify in his defense, including the use of pre-printed boards.  Petitioner also asserts that the prosecutor failed to disclose that George Rivera's cousin was employed by the prosecutor's office.

15

On direct appeal, the Appellate Division rejected Petitioner's claim of prosecutorial misconduct in connection with the summation.

> Both defendants contend that they were denied a fair trial as a result of misconduct on the part of the prosecutor during his summation. We disagree. Of the various remarks complained of, the only ones that were not fair comment were two brief passing references to the "only evidence you have heard...."

> During his summation, the prosecutor made the following remarks:

>> There's a question that keeps on coming up in this case and you may or may not see this, but I'm going to post this up, it says where were Suarez and Morales? Where were they? Specifically, where were they around 12 o'clock, 12:30, 1 o'clock, 1:18 . . . p.m. on October 23, 1997, when the State alleges that the murders took place?

>> Where were they? The evidence you've heard in this trial, the testimony from the stand, the different phone records, when you answer this question and they all come together to coalesce, the only answer is that Richard Morales and Miguel Suarez were in Bogota assisting in the commission of these murders.

>> . . . .

>> What did the people say? Where [was] Richard Morales? Where was Miguel Suarez? Where were they? You heard from different testimony. Darwin Godoy told you that Morales and Suarez were in Bogota committing these murders.

>> An independent witness from him, somebody that Darwin Godoy did not know, did not know existed, did not know would be coming forward later on in the case years later, George Rivera told you where Richard Morales . . . was.  He told you where Suarez was.

Where weren't they that day? They weren't at
work. We know from Michael Gigante, the supervisor
at Gateway Security, Richard Morales wasn't
scheduled to work that day, Miguel Suarez was not
scheduled to work that day.

Where were they? The only evidence we have
from the stand and from the evidence that you've
heard in this case is that they were in Bogota,
New Jersey, committing the murders.

Police Officer James Sepp . . . also told you
that Darwin Godoy when he got out of the car was
standing in the rear and that time after time,...
the phone would ring. And Darwin Godoy was very
short on the phone saying I can't talk now, I'm
with the police, words to that effect, and that he
would hang up the phone.

The phone records were analyzed in that case
and they come back to Miguel Suarez. So that when
Darwin Godoy testified from that stand and he
tells you that this was the exact amount of time
that Morales and . . . Suarez were in the . . .
house committing the murders and that the phone
was ringing and it was Suarez on the other line
and he was trying to alert him that he's with the
police, it's corroborated by the phone records and
by the testimony of Police Officer James Sepp.

That's exactly how it happened. So when you,
again, analyze is Darwin Godoy telling the truth,
there's independent corroboration of what he tells
you. The Judge will instruct you in this case
about certain concepts. One of the concepts is
that you can look at direct evidence, such as
testimony of say Darwin Godoy who saw Morales and
Suarez do something.

But you can also look at circumstantial
evidence because circumstantial evidence is
sometimes more powerful than direct evidence,
because it's objective, because it's something
that you can't make up, because it's a telephone
record like there, the Caller I.D. with Miguel
Suarez's phone number right blazing on the Caller
I.D. of the house that he killed three people in.

17

How does that happen unless he's involved? How does that happen that his cell phone number is directly there on the Caller I.D.[?]

George Rivera said that Miguel Suarez took the Toyota Avalon out of the driveway and drove it back to Newark and that he gave it to some people to burn.

Now how would George Rivera know that except that Miguel Suarez told him? They were in the same pod and they had been cell mates for a time. This was the person that Miguel Suarez trusted.

In its essence those two photographs show what Miguel Suarez and Richard Morales did on October 23rd, 1997. Where were they between approximately 12 o'clock and 1:30 or 1:45? <u>The only evidence that you have, the only evidence that you heard in this courtroom from that witness stand was that they were in Bogota, New Jersey, committing these brutal and horrific murders.</u>

[Emphasis added.]

At the conclusion of the prosecutor's summation, both defense counsel moved for a mistrial on the ground that the prosecutor inferentially commented on defendants' failure to testify, through his repeated remarks asking where defendants were on the day in question. The judge denied the motion, ruling as follows:

As far as where were Morales and Suarez, in some respects I do agree with [counsel], it was awfully close to saying how come they didn't testify. I don't think it was at that point where I would declare a mistrial.

Once again, I'm a little disappointed in the State's choice of words, but I'm not going to declare a mistrial because of that. It did almost say where were they, how come they didn't testify, but I think didn't go as far as . . . case law indicates. So your request for a mistrial is denied.

18

The Fifth Amendment forbids comment by the prosecution on the accused's failure to testify. <u>State v. Lanzo</u>, 44 N.J. 560, 563 (1965). Although not every prosecutorial comment on a defendant's failure to testify constitutes reversible error, "[r]eversal is mandatory if the prosecuting attorney has unambiguously called attention to defendant's failure to testify." <u>State v. Williams</u>, 113 N.J. 393, 454 (1988).

The bulk of the prosecutor' s summation constituted fair comment on the evidence and nothing more. <u>See</u> <u>State v. Perry</u>, 65 N.J. 45, 48 (1974); <u>State v. Farrell,</u> 61 N.J. 99, 103 (1972); <u>State v. Mayberry</u>, 52 N.J. 413, 437 (1968), <u>cert. denied</u>, 393 U.S. 1043, 89 S. Ct. 673, 21 L. Ed. 2d 593 (1969). To be sure, the prosecutor's brief references to the lack of other explanatory testimony from the stand may be viewed as error, but we are satisfied that under the circumstances, the error was harmless.

Such remarks are not so egregious to be deemed reversible error, especially where, as here, the jury was properly instructed that comments during summation did not constitute evidence and that the burden of proof lay with the State. <u>See</u>, <u>e.g.</u>, <u>State v. Scherzer</u>, 301 N.J. Super. 363, 439 (App. Div.) (reversible error not found where prosecutor sang the song Sound of Silence during summation and also commented that the "hole" in defendants' defense was that no explanation had been offered as to the whereabouts of the items used to sexually assault the victim), <u>certif. denied</u>, 151 N.J. 466 (1997); <u>State v. Engel</u>, 249 N.J. Super. 336, 381 (App. Div.) (reversible error not found where prosecutor commented during summation that the jury might wish to ask defendant why he would kill his former wife), <u>certif. denied</u>, 130 N.J. 393 (1991). Here, not only was the jury so instructed, but it was also told that defendants had no burden of proving anything and had the right not to testify. As such, any error which occurred was harmless beyond a reasonable doubt. <u>Chapman v. California</u>, 386 U.S. 18, 24, 87 S.Ct. 824, 823, 17. L..Ed. 2d 705, 710 (1967); <u>Scherzer</u>, <u>supra</u>, 301 N.J. Super. at 441.

Defendants also attribute error to the prosecutor's extensive use of pre-printed boards during summation, containing the highlights of his arguments. Counsel objected below, arguing that the jury could

misconstrue the writing on the boards as evidence.
Although the judge overruled the objection, he
cautioned the jury as follows:

> [The prosecutor] is going to use some notes that
> he's made and post it on the board. Those notes
> are not evidence and should not be considered by
> this jury as evidence.
>
> They're his contentions that he will be
> verbalizing on and he's also had printed out to be
> put on the board. Once again, do not consider them
> as evidence, they're not evidence. You're not
> going to have those with you in the jury room.
>
> It's just part of his summation where he'll
> be pointing out what he thinks important details
> for you. [sic] Some of the items have a smaller
> print than others. I will instruct the jurors to
> pay attention to [the prosecutor's] arguments and
> do not be distracted by any of those notes on the
> board.
>
> In other words, listen to him. If you could
> see them, that's up to you. You will not have them
> with you in the jury room.

The judge repeated this instruction after a break
during the prosecutor's summation, and further
instructed the jury in his final charge as follows:

> There was [sic] also comments made or items used
> at the summation by [the prosecutor], put up on
> the board, I told you those are not evidence.
> Those are just part of his comments. So keep that
> in mind. Other items he might have put on the
> board is [sic] evidence. So you have to separate
> that.

There was no error, much less reversible error, in
the prosecutor's use of pre-printed boards. Nothing
contained thereon exceeded fair comment on the
evidence. Contrary to Morales' representation, the
statement on one of the boards regarding what Betsy
Tufino overheard did comport with her testimony with
the exception of with whom Morales was speaking. In any
event, the jury was cautioned on three separate
occasions that the boards contained nothing more than

the prosecutor's arguments and were not to be
considered as evidence in the case.

(Answer, Ex. 3, Appellate Division Opinion at 19-25.)

The U.S. Supreme Court has recognized the obligation of a
prosecutor to conduct a criminal prosecution with propriety and
fairness.

He may prosecute with earnestness and vigor – indeed,
he should do so.  But, while he may strike hard blows,
he is not at liberty to strike foul ones.  It is as
much his duty to refrain from improper methods
calculated to produce a wrongful conviction as it is to
use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

As a general rule, under U.S. Supreme Court precedent, where
a prosecutor's opening or closing remarks are challenged in
habeas, "[t]he relevant question is whether the prosecutor's
comments 'so infected the trial with unfairness as to make the
resulting conviction a denial of due process.'" Darden v.
Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.
DeChristoforo, 416 U.S. 637 (1974)).  Thus, "Supreme Court
precedent counsels that the reviewing court must examine the
prosecutor's offensive actions in context and in light of the
entire trial, assessing the severity of the conduct, the effect
of the curative instructions, and the quantum of evidence against
the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir.
2001).

More specifically, the Supreme Court has held that prosecutorial comment on a defendant's failure to testify violates the Fifth Amendment right to remain silent, applicable to the states through the Fourteenth Amendment. See Griffin v. California, 360 U.S. 609 (1965). Nevertheless, such a federal constitutional error does not require reversal where the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 23-24 (1967).

Here, the Appellate Division reviewed the prosecutor's comments in the context of the entire trial, including the quantum and nature of the evidence against Petitioner and the curative instructions given by the trial court, and found any error harmless beyond a reasonable doubt. The Appellate Division decision is neither contrary to nor an unreasonable application of controlling Supreme Court precedent. Petitioner is not entitled to relief on these claims.

Petitioner also asserts here that the prosecutor improperly failed to disclose that George Rivera's cousin was employed by the prosecutor's office. This issue was raised by Petitioner in his petition for post-conviction relief. (Answer, Ex. 10, Petitioner's Brief in support of petition for post-conviction relief, 50-53.) There, this issue was framed as a violation of Brady v. Maryland, 373 U.S. 83 (1963), as a failure to disclose material exculpatory evidence. Petitioner also asserted that

22

trial counsel was ineffective for failing to bring this fact out
in an effort to discredit George Rivera.  The trial court
rejected the claim.

> Petitioner argues that George Rivera fabricated
> his story in order to obtain a favorable plea and
> raises various issues with respect to trial counsel's
> failure to discredit Mr. Rivera which he now contends
> also constituted ineffective assistance of counsel. ...
> Alternatively, [Petitioner] argues that an undercover
> detective, Michael Rodriguez, pretended to be Mr.
> Rivera's cousin and further argues that they might in
> fact be cousins.  In any event he contends, without any
> substantiation, that these two individuals "hatched
> this entire scheme to help Rivera get out of jail and
> ensure that Petitioner rotted in jail."

(Answer, Ex. 12, Letter Opinion at Da-370-Da371 (October 26,
2007).)  The Appellate Division affirmed substantially for the
reasons stated by the trial court.  See State v. Suarez, 2010 WL
2010930 (N.J. Super. App. Div. May 18, 2010).

The prosecution in a criminal matter has a constitutional
obligation to disclose exculpatory evidence to the defendant.
See Brady v. Maryland, 373 U.S. 83 (1967); Giglio v. United
States, 405 U.S. 150, 154 (1972) ("A finding of materiality of
the evidence is required under Brady.").  Exculpatory evidence is
considered material "if there is a reasonable probability that,
had the evidence been disclosed to the defense, the result of the
proceeding would have been different."  Strickler v. Greene, 527
U.S. 263, 280 (1999) (quoting United States v. Bagley, 473 U.S.
667, 682 (1985)).  Nondisclosure merits relief only if the
prosecution's failure "'undermines confidence in the outcome of

the trial.'" <u>Kyles v. Whitly</u>, 514 U.S. 419, 434 (1995) (quoting <u>Bagley</u>, 473 U.S. at 678).

Petitioner presented no evidence to the trial court (or to this Court) to substantiate his claim that George Rivera had a cousin employed by the prosecutor's office, at all, or that any such cousin participated in a plan to present false evidence at Petitioner's trial. Nor, in light of the substantial evidence against Petitioner, is there any basis to conclude that the result of his trial would have been different if evidence of the purported relationship had been produced to Petitioner and used at trial. Accordingly, although the trial court did not specifically cite to <u>Brady</u> in its decision, this Court finds that the decision of the state court was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was the state court decision based upon an unreasonable determination of the facts in light of the evidence presented to it. Petitioner is not entitled to relief on this claim.

B.    <u>Evidence Issues</u>

     1.    <u>Admission of Petitioner's Statement</u>

Petitioner asserts that the trial court improperly admitted Petitioner's telephonic statements to an investigator, made before Petitioner was advised of his rights, allegedly in violation of Petitioner's Fifth Amendment right to remain silent

24

and his Sixth Amendment right to assistance of counsel, both applicable to the states through the Fourteenth Amendment.

The Appellate Division rejected this argument on direct appeal.

> Suarez contends that the trial judge erred in failing to suppress his statements, made via telephone, to Officer Barbato without benefit of <u>Miranda</u> [fn3] warnings. ... We disagree with these arguments.

> [fn3] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> Warnings apprising an individual of his Fifth Amendment right against self-incrimination are required whenever an individual is subjected to custodial interrogation by law enforcement officers. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694, 706-07 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706-07. <u>Accord</u> <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114.S. Ct. 1526, 1528, 128 L. Ed. 2d 293, 298; <u>State v. Keating</u>, 277 N.J. Super. 141, 144 (App. Div. 1994). In determining whether a custodial interrogation has occurred, a court must examine all of the circumstances surrounding the interrogation. <u>State v. O'Loughlin</u>, 270 N.J. Super. 472, 477.(App. Div. 1994); <u>State v. Coburn</u>, 221 N.J. Super. 586, 596 (App. Div. 1987), <u>certif. denied</u>, 110 N.J. 300 (1988). It is custodial interrogation and not the mere focus upon a particular suspect which implicates the requirement that the <u>Miranda</u> warnings be given. <u>State v. Graves</u>, 60 N.J. 441, 448 (1972); <u>Coburn</u>, <u>supra</u>, 221 N.J. Super. at 595.

> In our view, the very brief telephone conversation between Suarez and Officer Barbato, during which Barbato simply requested Suarez come in and speak with police and asked absolutely no questions regarding the Bogota murders, does not qualify as a custodial interrogation. Defendant's status as a suspect in no way alters this determination. Accordingly, we find

25

that defendant was neither in "custody," nor being "interrogated" when he angrily responded that the police would never find him and that he was not going to turn himself in.

...

    ... There was no denial of Suarez's Fifth Amendment rights ... .

(Answer, Ex. 3, Opinion of Appellate Division at 28-30.)

Pursuant to the Fifth Amendment to the United States Constitution, "No person ... shall be compelled in any criminal case to be a witness against himself ... ." In <u>Miranda v. Arizona</u>, the Supreme Court of the United States held that:

when an individual <u>is taken into custody or otherwise deprived of his freedom</u> by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478-79 (footnote omitted) (emphasis added).  Thus, the Fifth and Fourteenth Amendments' prohibition against

compelled self-incrimination require that <u>custodial interrogation</u> be preceded by advice to the defendant that he has the right to remain silent and also the right to an attorney.

The Supreme Court, however, has "never held that a person can invoke his <u>Miranda</u> rights anticipatorily, in a context other than 'custodial interrogation.'" <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 182, n.3 (1991).  <u>See also</u> <u>Montejo v. Louisiana</u>, 556 U.S. 778, 795 (2009) ("If the defendant is not in custody then [<u>Miranda</u> and its progeny] do not apply.").

Here, the Appellate Division correctly applied <u>Miranda</u> and its progeny in holding that Petitioner was not subjected to a custodial interrogation and that there was no violation of his <u>Miranda</u> rights.  Petitioner is not entitled to relief on this ground.

Petitioner also asserts a violation of his Sixth Amendment rights in connection with the failure to suppress his telephone statement.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."  The Sixth Amendment right to counsel, however, "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991) (citations and

internal quotation marks omitted).  Petitioner was not under indictment at the time of the telephone conversation,[6] so there was no violation of his Sixth Amendment right to counsel. Accordingly, Petitioner is not entitled to relief on this claim.

   2.  Blood Evidence

   Petitioner claims that the state's failure to preserve and test blood stains on Darwin Godoy's clothing deprived Petitioner of his Sixth and Fourteenth Amendment rights to a fair trial.

   During the traffic stop, Officer Sepp observed blood on Godoy's shirt, which he attributed to Godoy's nail biting. Petitioner asserts that Godoy committed the murders and that the blood on Godoy's shirt must, therefore, be the victims' blood and exculpatory of Petitioner.

   At the PCR hearing, counsel for the government advised the Court that the shirt had been seized and tested, that the blood on the shirt did not match any of the victims, and that the shirt still existed.  Counsel for Petitioner did not dispute that. (Answer, Ex. 36, Tr. at 5-7 (March 30, 2007).)

   The PCR court rejected this claim, on the ground that the shirt had been tested and that the reports had been produced, and the Appellate Division affirmed.  (Answer, Ex. 12, Letter Opinion

------

   [6] The indictment against Petitioner is dated April 3, 1998. (Answer, Ex. 5, at Da1.)

at Da372-Da373 (N.J. Super., Law Div., Bergen Co. Oct. 26, 2007).)

As noted above, in Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In United States v. Agurs, 427 U.S. 97, 111 (1976), the Supreme Court held that the prosecution had a duty to disclose some material exculpatory evidence, but did not go so far as to require the prosecution "routinely to deliver his entire file to defense counsel."  In Arizona v. Youngblood, 488 U.S. 51 (1988), the Supreme Court went to the next step and considered the duty of the State to preserve potentially exculpatory evidence.  There, the Court held that "when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," 488 U.S. at 57, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law," id. at 58.

Here, the PCR court properly found that Petitioner had failed to establish either that the potentially exculpatory

evidence was destroyed or that there was any bad faith on the part of the State in its treatment of the blood-stained shirt. Petitioner is not entitled to relief on this claim.

C.    Ineffective Assistance of Counsel

Petitioner challenges his trial counsel's performance on numerous grounds, including failure to present evidence regarding the discovery of George Rivera's handwritten recantation letter, failure to present testimony of Nicholas Kyriazis to discredit George Rivera's testimony, failure to present testimony of Melvin Collins to discredit George Rivera's testimony, failure to present evidence establishing that George Rivera had access to Petitioner's pretrial discovery, failure to present an expert in fiber analysis, failure to present a statistician to testify regarding the state's fiber evidence, failure to move to suppress Glenn Kohles's out-of-court identification of Petitioner, failure to present an expert in eyewitness identification to counter Kohles's out-of-court identification, failure to utilize existing blood evidence as proof of Petitioner's innocence, failure to present a quasi-alibi defense based on Petitioner's presence at his girlfriend's house several hours before and several hours after the murder, and failure to present evidence that Edwin Nieves was hospitalized at the time he was alleged to have accompanied Petitioner to purchase the murder weapon.   In addition, Petitioner challenges appellate counsel's failure to

challenge the trial court's omission of a general identification charge and a specific cross-racial identification charge.

In his state petition for post-conviction relief, the trial court rejected all of these challenges.

> The Sixth Amendment to the United States Constitution affords defendants in criminal cases the right to counsel. ... The standard for determining whether a defendant has received adequate legal representation was set forth by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The decision in <u>Strickland</u> was amplified by <u>U.S. v. Cronic</u>, 466 U.S, 648 (1984), which sets forth the burden of proof that a defendant must satisfy to show ineffective assistance of counsel. Likewise, the New Jersey Supreme Court adopted the <u>Strickland</u> test in <u>State v. Fritz</u>, 105 N.J. 42 (1987).

> The Court in <u>Strickland</u> set forth a two-part test to evaluate ineffective assistance of counsel claims. Under <u>Strickland</u>, in order to demonstrate ineffective assistance of counsel, a defendant must first demonstrate deficient performance of counsel. This requires a showing that counsel made errors so serious that counsel was not functioning as guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance actually prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. <u>Strickland v. Washington</u>, 466 U.S. at 687. <u>See also</u>, <u>State v. Marshall</u>, 148 N.J. 89,156 (1997); <u>State v. Fritz</u>, 105 N.J. 42,52 (1987). Courts do not need to address both prongs of the two part test if the defendant makes an insufficient showing on one. <u>Strickland</u> at 697. <u>See also</u>, <u>State v. Pennington</u>, 119 N.J. 547, 591 (1990).

> When reviewing counsel's performance at trial, judicial scrutiny must be highly deferential because "it is all too tempting for a defendant to second guess counsel's assistance after conviction." <u>Strickland</u> at 690. The Court, upon reviewing an ineffective assistance claim, must avoid the "distorting effects of hindsight." <u>State v. Norman</u>, 151 N.J. 5,37 (1997) (quoting <u>Strickland</u>). As previously noted, there is a

strong presumption that defense counsel acted within
the wide range of reasonable professionalism. <u>Id.</u>

...

    Further ineffective assistance is alleged with
respect to additional testimony by Nieves that
petitioner sought Nieves' help in procuring one or more
of the guns that petitioner then used in committing the
murder. However, information as to when, where, and how
petitioner may have procured a weapon used in these
murders is certainly relevant and probative. While
petitioner now avers that Nieves was allegedly
hospitalized when this occurred and in Paragraph 187 of
his petition points to hospital admission/release
records, no such records have been provided in support
of this contention.

...

    With respect to the fibers discovered in Suarez's
car and on the duct tape used on the victims,
petitioner argues that counsel should have called his
own fiber expert. In his petition, Mr. Suarez also
refers to proposed testimony from a statistician to
qualify and quantify the State's fiber evidence.
Petitioner states that "such expert witnesses will be
identified at a later date and produced for direct and
cross-examination at an evidentiary hearing". However,
before such an evidentiary hearing is ordered the
petitioner must make a threshold showing that such a
hearing is warranted. Petitioner has failed to do so,
as he has not identified any such proposed expert
witnesses nor submitted any reports and/or affidavits
from such experts detailing their scientific
conclusions. Furthermore, as the Appellate Division
held, there was overwhelming evidence that the crimes
occurred. There is no showing that a fiber expert would
have changed the outcome of the case considering the
testimony of Godoy, Tufino, and Rivera all corroborated
the allegation that Suarez killed those three victims.

...

    Petitioner argues that George Rivera fabricated
his story in order to obtain a favorable plea and
raises various issues with respect to trial counsel's
failure to discredit Mr. Rivera which he now contends

also constituted ineffective assistance of counsel.
Specifically, petitioner asserts that a subsequent
search of petitioner's jail cell revealed a recantation
letter written by Mr. Rivera. Alternatively, he argues
that an undercover detective, Michael Rodriguez,
pretended to be Mr. Rivera's cousin and further argues
that they might in fact be cousins. In any event he
contends, without any substantiation, that these two
individuals "hatched this entire scheme to help Rivera
get out of jail and ensure that Petitioner rotted in
jail." However, the trial record establishes that trial
counsel and counsel for the co-defendant did in fact
argue that the jury should be precluded from hearing
any testimony with respect to petitioner's alleged
plot to kill two of the witnesses. This Court is also
mindful of the State's argument that had defense
counsel attempted to advance the claim that Rivera
concocted the hit man story, that it would have "opened
the door" for the State to present its evidence,
including tape recordings, demonstrating that
petitioner was indeed attempting to hire a hit man to
kill two of the witnesses, who ultimately testified
against him. Thus, as this appears to have been an
issue of trial strategy, the court does not find that
petitioner has adequately established a basis for
relief.

    Similarly, the Court rejects petitioner's argument
that trial counsel was ineffective in failing to call
two witnesses, Nicholas Kyriazis and Melvin Collins,
who allegedly had knowledge that Mr. Rivera fabricated
a story to gain a more favorable sentence and/or that
Rivera had access to the petitioner's pre-trial
discovery, thus furnishing him with a source of the
facts which he then utilized in his effort to "frame"
the petitioner. Again the State argues that the
introduction of such testimony would have "opened the
door" to admit its damaging evidence against the
petitioner, and hence defense counsel's decision not to
call these witnesses constituted sound trial strategy.

    Petitioner next argues that trial counsel's
performance was deficient in failing to file a
pre-trial motion to suppress the identification made by
Glen Kohles as being suggestive, and failed to hire or
consult with an expert, particularly Dr. Michael R.
Leippe, Ph.D., in the field of reliability of
eyewitness identification. However, it does appear that

33

defense counsel did in fact move to suppress this
out-of-court identification, which the trial court
denied after a testimonial hearing. Also, the
petitioner indicates that this expert has not been
retained, and no report from this or any other expert
has been provided to lend factual support for the
defendant's proffer as to such expert's testimony.

With respect to this identification petitioner
further contends that trial and appellate counsel were
both ineffective in failing to argue that the jury
should have been given a general identification charge
and a specific cross-racial identification charge,
which he argues were both crucial to the jury's proper
interpretation of Mr. Kohles' identification of the
defendant. However, this Court, in reviewing the trial
testimony and evidence in its entirety, concludes based
upon the significant weight of that evidence that the
petitioner has failed to demonstrate that the alleged
error was capable of producing an unjust result. Since
trial counsel apparently did not request these jury
charges, appellate counsel would undoubtedly be aware
that any such argument, if advanced on appeal, would be
governed by the plain error standard. In light of the
Appellate Division's earlier determination that there
was overwhelming evidence of defendant's guilt this
Court concludes that any ineffective assistance of
either trial or appellate counsel has not been shown to
be so sufficient as to likely have affected the outcome
of this trial so as to warrant the post-conviction
relief which petitioner now seeks.

...

Finally, petitioner contends that trial counsel
was ineffective in failing to raise a "quasi-defense",
i.e. that Betsy Tufino's mother, if called, would have
testified that petitioner was observed in the home both
approximately 90 minutes before and after the murders
were committed. However, this proffer appears to be
hearsay which is unsupported by any affidavit or
certification of Ms. Tufino's mother. Moreover, even if
it were so supported, it would not constitute an alibi,
as petitioner candidly concedes, nor in this court's
opinion would it be likely to have changed the result
given the overwhelming evidence against the petitioner.

> In light of the above, the Court concludes that the errors and deficiencies now alleged by petitioner, both individually and cumulatively, are insufficient to warrant an evidentiary hearing or to grant the post-conviction relief sought by petitioner. Accordingly, defendant's petition for post-conviction relief is hereby DENIED.

(Answer, Ex. 12, Letter Opinion at Da363-Da373 (N.J. Super., Law Div., Bergen Co. Oct. 26, 2007).)

On appeal, citing to Strickland, the Appellate Division affirmed substantially for the reasons stated by the trial court. State v. Suarez, 2011 WL 2010930 at *4.

The state courts correctly identified and applied the controlling Supreme Court precedent regarding the Sixth Amendment right to effective assistance of counsel.[7]  Accordingly, Petitioner is not entitled to relief on this claim.

D.   Cumulative Error

Finally, Petitioner asserts that cumulative error deprived him of his Sixth and Fourteenth Amendment rights.

The PCR court found that the errors and deficiencies alleged by Petitioner were insufficient, "both individually and cumulatively," to warrant relief, and the Appellate Division

---

[7] The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a state defendant the effective assistance of counsel on a first direct appeal as of right.  Evitts v. Lucey, 469 U.S. 387 (1985).  The Strickland standard for effective assistance of counsel applies to appellate counsel.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).

affirmed.   (Answer, Ex. 12, Letter Opinion at Da373 (N.J. Super.,
Law Div., Bergen Co. Oct. 26, 2007).)

      Under certain circumstances, cumulative errors may
demonstrate that a criminal defendant was denied a fair trial,
even though individual errors do not justify relief.

> Individual errors that do not entitle a petitioner to
> relief may do so when combined, if cumulatively the
> prejudice resulting from them undermined the
> fundamental fairness of his trial and denied him his
> constitutional right to due process.  Albrecht v. Horn,
> 471 F.3d 435, 468 (3d Cir. 2006).  "Cumulative errors
> are not harmless if they had a substantial and
> injurious effect or influence in determining the jury's
> verdict, which means that a habeas petitioner is not
> entitled to relief based on cumulative errors unless he
> can establish 'actual prejudice.'"  Id. (citing Brecht
> v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123
> L.Ed.2d 353 (1993)).

Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008).

      Here, the state courts' determination that Petitioner had
failed to establish a right to relief based upon "cumulative
error," is neither contrary to nor an unreasonable application of
clearly established federal law, nor is the decision based on an
unreasonable determination of the facts in light of the evidence
presented.  As noted by the state courts, the evidence against
Petitioner was overwhelming.  Petitioner is not entitled to
relief on this claim.

                  IV.  CERTIFICATE OF APPEALABILITY

      Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or
judge issues a certificate of appealability, an appeal may not be

36

taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, jurists of reason would not disagree with this Court's resolution of Petitioner's constitutional claims. No certificate of appealability will issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition will be denied. An appropriate order follows.

s/ Faith S. Hochberg
Faith S. Hochberg
United States District Judge

Dated: December 20, 2012

37